# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td></td><td>100 EAST FIFTH STREET, ROOM 540</td><td></td></tr>
<tr><td>Deborah S. Hunt</td><td>POTTER STEWART U.S. COURTHOUSE</td><td>Tel. (513) 564-7000</td></tr>
<tr><td>Clerk</td><td>CINCINNATI, OHIO 45202-3988</td><td>www.ca6.uscourts.gov</td></tr>
</table>

Filed: July 13, 2015

Ms. Jeanine M. Brunson
Mr. Shane N. Cralle
Mr. John N. O'Brien II
Office of the U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Mr. Richard A. Cline
580 S. High Street, Suite 200
Columbus, OH 43215

Re: Case Nos. 13-2655/2656, *USA v. Frank Richardson*
Originating Case No. : 2:10-cr-20397-2

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 13-2655/2656

FRANK RICHARDSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 2:10-cr-20397; 2:11-cr-20444—Gerald E. Rosen, Chief District Judge.

Argued:  March 6, 2015

Decided and Filed:  July 13, 2015

Before:  COLE, Chief Judge; MOORE and CLAY, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:**  Richard A. Cline, CLINE, MANN & CO., LLC, Powell, Ohio, for Appellant.
Shane Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.  **ON
BRIEF:**  Richard A. Cline, CLINE, MANN & CO., LLC, Powell, Ohio, for Appellant.  Shane
Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

### OPINION

───────────────

        CLAY, Circuit Judge.  Defendant Frank Richardson appeals from the December 4, 2013
judgments of the United States District Court for the Eastern District of Michigan sentencing him
to 1,494 months of incarceration for committing five counts of armed robbery in violation of
18 U.S.C.  §  1951(a), five counts of using a firearm in furtherance of a crime of violence in

violation of 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2).  On appeal, Richardson challenges the district court's denial of his motion to dismiss on speedy trial grounds, as well as the district court's evidentiary rulings, jury instructions, and sentence imposed.

For the reasons set forth below, we **AFFIRM** the judgments of the district court.

## BACKGROUND

### A.  Procedural History

This appeal relates to two separate cases that were consolidated for the purposes of trial, Case No. 2:10-cr-20397 ("Case 1") and Case No. 2:11-cr-20444 ("Case 2").

In the Case 1 indictment, filed on August 10, 2010, Richardson was charged with four counts of interference with commerce by robbery in violation of 18 U.S.C. § 1951(a), four counts of using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Richardson was arraigned on August 19, 2010 and pleaded not guilty to all counts.

The Case 2 indictment, filed on July 12, 2011, charged Richardson with one count of interference with commerce by robbery in violation of 18 U.S.C. § 1951, and one count of using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c).  Richardson was arraigned on April 5, 2012, approximately nine months after his indictment.  He pleaded not guilty to both counts.

The district court issued an order consolidating the two cases on February 26, 2013, and Richardson's trial began on June 11, 2013.  Nearly three years elapsed between Richardson's Case 1 indictment and the beginning of trial.  During this time, two attorneys assigned to represent Richardson withdrew, and the parties engaged in "extensive pre-trial pleadings, status conferences, and motions." *Richardson's Br.* at 5.  At trial, the government called as witnesses a number of law enforcement officers, as well as patrons and employees of the burglarized stores who had been present during the robberies.  The government also called three individuals who had allegedly participated in the robberies with Richardson.

On June 28, 2013, a jury found Richardson guilty on all counts. Richardson was sentenced to 210 months of imprisonment for each count of interference with commerce by robbery, respectively, and 120 months of imprisonment for being a felon in possession of a firearm, to be served concurrently. In addition, Richardson was sentenced to 84 months of imprisonment for one § 924(c) count and 300 months of imprisonment for the other four § 924(c) counts, respectively, to be served consecutively to each other and the other sentences, as mandated by § 924(c)(1)(D)(ii). Altogether, Richardson was sentenced to 1,494 months of imprisonment. Richardson timely appealed.

## B. Factual History

Richardson was convicted of participating in the armed robbery of five stores in and around Detroit, Michigan between February 22, 2010 and May 28, 2010. The stores were all robbed at gunpoint during business hours. In each instance, the robbers wore masks and gloves and stole electronics, primarily cellular telephones. At least one robber was armed during each robbery. Richardson never entered any of the stores during the commission of the robberies. Instead, he planned the robberies, provided supplies, and served as a lookout while they were taking place. The following facts are based on witness testimony at trial.

### 1. First Robbery

On February 22, 2010, Richardson and four other men robbed a T-Mobile store in Detroit, Michigan. Richardson coordinated the robbery with Jerome Andrews (his nephew), Derick Shirley, Derrick Bivens, and Tevin Bivens. In preparation for the robbery, Richardson and Shirley purchased plaid laundry bags to carry the stolen merchandise. Richardson then drove to pick up the other men in his SUV. On the ride, he provided the men with masks and gloves to wear, as well as at least one firearm. When they arrived at the store, Shirley and Richardson stayed in the vehicle to act as lookouts, while Andrews, Derrick Bivens, and Tevin Bivens executed the robbery.

Upon entering the store, Derrick Bivens displayed his firearm and ushered the employees and customers to the back storage room at gunpoint. The other men collected approximately thirty phones in the laundry bags that Richardson had purchased with Shirley. During the

robbery, Richardson called Derrick Bivens to confirm that there was no cause for concern outside. Once the robbery was completed, all of the men returned to Richardson's SUV and drove back to Richardson's mother's house. Richardson subsequently sold the stolen phones to a contact of his and split the proceeds among the men.

### 2. Second Robbery

Eight days after the first robbery, on March 3, 2010, the men robbed another T-Mobile store in Detroit, Michigan. Before the robbery, Richardson, Tevin Bivens, and Andrews stole a van, which they disguised to look like a security van. As with the first robbery, Richardson picked everyone up on the day of the robbery. They then procured masks, gloves, laundry bags, and guns, and Richardson dropped the men off at the stolen van. Richardson drove behind the van to the T-Mobile store in order to obscure the stolen van's license plate. The men parked the stolen van outside the store, and Richardson remained in his SUV.

Derrick Bivens and Shirley entered the store, with Bivens brandishing a gun, and stole a number of cellular phones. After the robbery, Richardson and the other men met at Richardson's house, where they unpacked the stolen phones. Richardson then directed Andrews to get rid of the stolen van, while Richardson departed to sell the phones to his contact.

### 3. Third Robbery

A month later, on April 3, 2010, the men robbed a Radio Shack in Detroit, Michigan. Richardson selected the store and determined when the robbery would occur. Because Shirley was not able to participate in this robbery, Richardson and Andrews recruited a man named Curtis Williams to take his place. Richardson once again supplied the masks, gloves, laundry bags, and firearms. The men drove to Radio Shack in a different stolen van while Richardson followed in his SUV. The store was crowded when they got there, so the men waited in the van until they got word from Richardson to begin the robbery. Derrick Bivens, Andrews, and Williams then entered the store brandishing weapons. They directed the employees and customers to the back of the store, collected telephones, and left in the van. They then gave the phones to Richardson, who sold them and split the proceeds with the other men.

### 4. Fourth Robbery

On May 8, 2010, the men robbed another T-Mobile store in Detroit, Michigan. As with the previous robberies, Richardson coordinated the logistics and provided masks, gloves, laundry bags, and guns. As before, the men drove in a different stolen van while Richardson followed behind in his SUV. When they arrived at the store, they noticed a woman struggling to open the door. In order to assess the situation, Richardson went to the door pretending to be a customer. An employee informed him that the store was experiencing a power outage and was closed. Richardson decided to proceed with the robbery, and the men convinced Shirley to go to the door without a mask, pretending to be a customer, in order to gain access to the store.

As soon as the employee opened the door to speak with Shirley, Shirley pushed the door open and commanded the employees to go to the back of the store. Andrews and Derrick Bivens then entered the store as well. During the course of the robbery, an employee approached the store from the outside, noticed Bivens stealing money from the cash register, and ran away. Upon seeing the employee, the robbers ran to the van and drove off. They eventually met to place their guns in a compartment in Richardson's SUV, and Richardson sold the phones and distributed the proceeds.

### 5. Fifth Robbery

On May 28, 2010, the men conducted the final robbery at a Radio Shack in Eastpointe, Michigan. This time, the participants were Richardson, Andrews, Tevin and Derrick Bivens, and a man named Montez Fails. As with the previous robberies, Richardson collected the men, who then drove to the store separately in a stolen vehicle while Richardson drove behind them in his SUV. Richardson gave Bivens a 9-millimeter semiautomatic handgun to use during the robbery. As he had done during the previous robberies, Richardson stayed in the SUV, and the men entered the store upon Richardson's signal. Once they were inside, the men moved the employees and customers to the back of the store. However, one employee was able to escape out of the back door undetected. The men gathered the phones and a television, then ran out the back door and drove away with Richardson following directly behind them.

As they were driving away from the store, the men were intercepted by members of Detroit's Violent Crime Task Force, who had been surveilling them throughout the day. The men in the van evaded the officers initially, but Richardson was stopped and arrested. The men abandoned the stolen van and tried to run away, but were all eventually caught and arrested. The police found the stolen phones, television, masks, gloves, and a firearm in and around the stolen van.

### 6. Indictments

Frank Richardson and others were subsequently charged in the Case 1 indictment for their involvement in the robberies that took place on February 22, 2010, March 3, 2010, May 8, 2010, and May 28, 2010. Richardson and Williams were charged in the Case 2 indictment for their involvement in the April 3, 2010 robbery.

### DISCUSSION

### A. Speedy Trial Claim

When considering a defendant's speedy trial claim, we review questions of law *de novo* and questions of fact for clear error. *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005). This standard of review applies both to claims raised under the Sixth Amendment and those raised under the Speedy Trial Act, 18 U.S.C. § 3161. *Id.*; *United States v. DeJohn*, 368 F.3d 533, 538 (6th Cir. 2004).

Richardson raises his speedy trial claim under the Sixth Amendment and the Speedy Trial Act. The Speedy Trial Act typically requires that a criminal trial begin within seventy days of a defendant's indictment or initial court appearance, but allows for periods of exclusion from the seventy day clock in certain instances. *United States v. Brown*, 498 F.3d 523, 529 (6th Cir. 2007). Meanwhile, the Sixth Amendment guarantees to defendants the right to a speedy trial, the potential violation of which is analyzed under a four factor test, which will be discussed below. *Id.* at 530. We find that Richardson's speedy trial claim fails under both the Speedy Trial Act and the Sixth Amendment analysis.

### 1. Timeline of Events Relevant to Speedy Trial Analysis

While Richardson's speedy trial argument relates exclusively to Case 2, the timeline relevant to the analysis of his claim is intertwined with the timeline of Case 1. Richardson's attorneys in both Case 1 and Case 2 were replaced multiple times in the period leading up to his trial. As a result of this attorney turnover and both parties' desire to resolve Case 2 after Case 1, the trial date for Case 2 was adjourned multiple times. Relevant portions of the timeline are summarized below.

#### a. Delay from Indictment to Arraignment

The Case 2 indictment was filed on July 12, 2011. Richardson was formally arraigned in Case 2 on April 5, 2012, nearly nine months later. Richardson was in the custody of Michigan authorities until February 28, 2012, at which point he was remanded to the custody of the United States Marshals.

#### b. Exclusion from June 4, 2012 to November 13, 2012

Case 2 was scheduled for trial on June 4, 2012. On May 24, 2012, the parties entered a stipulation requesting that the court reschedule the trial for November 13, 2012 and exclude the time between June 4, 2012 and November 13, 2012 from the speedy trial calculation. The district court's stipulation and order recognized that attorneys for both parties were still trying to reach a pre-trial resolution in Case 2, which was dependent on the resolution of Case 1. Richardson's attorney advised the court that Richardson had no objections to a delay in Case 2.

#### c. Exclusion from November 13, 2012 to February 5, 2013

The parties first discussed the need to adjourn the November 13, 2012 Case 2 trial date at an October 22, 2012 status conference in Case 1. At that status conference, Mr. Daly, who had just become Richardson's third attorney in Case 1, was appointed to represent Richardson in Case 2 as well. During the status conference, Mr. Daly, the government, and the court acknowledged that it would likely be necessary to adjourn the November 13, 2012 trial date in Case 2, given Mr. Daly's new appointment. Mr. Daly agreed to discuss the matter with Richardson, and the government volunteered to circulate a draft stipulation.

### i. Government's Motion to Adjourn Trial

Despite not having been formally adjourned, the trial in Case 2 did not begin on November 13, 2012.  On November 28, 2012, two weeks after the scheduled trial date, the government filed a motion to adjourn the trial.  In that motion, the government noted that it had sent a proposed stipulation for adjournment of trial to Mr. Daly, as was discussed during the October 2012 status conference.  In response, Mr. Daly informed the government that it would take him a week to speak with his client.  On January 8, 2013, the district court scheduled a hearing to address the government's motion.

### ii. Richardson's Motion to Dismiss for Violation of Speedy Trial

Two days after notice of the hearing was filed, on January 10, 2013, Richardson filed a motion to dismiss Case 2 with prejudice for violation of his right to a speedy trial.  In his motion, Richardson argued that he was unaware of and had not consented to his previous attorney's May 24, 2012 stipulation to adjourn the trial.  Richardson also argued that the government was dilatory in delaying Richardson's arraignment in Case 2 because he was already in their custody pending Case 1.  Finally, Richardson argued that he was prejudiced by the death of two witnesses who were prepared to testify that they were involved in the robbery and that he was not.

### iii. Hearing on Motion to Dismiss on Speedy Trial Grounds

At a subsequent hearing, the district court determined that, given the extent to which the trial delay was caused by Richardson's "inabilities to get along with his lawyers [and] the filing of grievances . . . , there [was] really no way that this case could have proceeded to trial on the scheduled date."  (R. 65, Hearing Transcript, Page ID # 272.)  At the hearing, Mr. Daly indicated that he would not have been prepared to go to trial on November 13, 2012 and focused his argument primarily on the time period between Richardson's indictment and arraignment in Case 2.  As to that period, the government conceded that it was partially to blame for the delay.  The government explained that, because there had been ongoing informal conversations about Case 2 with Richardson's first attorney in Case 1, it took the government some time to realize that Richardson had never been formally arraigned in Case 2.

The district court ultimately determined that Richardson did not suffer any prejudice as a result of the pre-arraignment delay, despite the government's partial blame for causing it. Accordingly, the district court denied Richardson's motion to dismiss the case and agreed to consolidate Case 1 and Case 2. The parties then agreed to an adjournment of the combined case and stipulated to a speedy trial exclusion. The court found the time between November 13, 2012 and February 5, 2013 to be excludable delay.

### d. Exclusion from February 5, 2013 to June 11, 2013

The district court entered an order on February 26, 2013 officially consolidating the two cases for the purposes of trial and setting a trial date for June 11, 2013. In that order, the district court found that the period of time between February 5, 2013 and June 11, 2013 was all excludable delay agreed to by the parties in order to provide Mr. Daly with sufficient time to prepare for trial.

### 2. Speedy Trial Act Claim

The Speedy Trial Act "generally requires a federal criminal trial to begin within seventy days after a defendant is charged or makes an initial appearance . . . ." *Brown*, 498 F.3d at 529; 18 U.S.C. § 3161(c)(1). However, the Act provides for the exclusion of certain periods of delay from the calculation of these seventy days. 18 U.S.C. § 3161(h)(1). These exclusions include delays for pretrial motions and proceedings. *Id.* If, after accounting for all permissible exclusions, the seventy day deadline is not met, "the district court must dismiss the indictment, either with or without prejudice." *United States v. Monger*, 879 F.2d 218, 220 (6th Cir. 1989).

### a. Starting Point for the Seventy Day Calculation

The first determination that must be made in addressing Richardson's Speedy Trial Act claim is the point in time at which the seventy day clock began to run. We have held that the Speedy Trial Act clock begins to run after a defendant's indictment or after the defendant's first court appearance, "whichever occurs later." *United States v. Gardner*, 488 F.3d 700, 717 (6th Cir. 2007). Richardson's first court appearance related to Case 2 occurred after his indictment at his arraignment on April 5, 2012. The seventy day clock therefore began running after his arraignment.

### b. Seventy Day Calculation

Sixty days elapsed between the date of Richardson's arraignment and the original June 4, 2012 trial date. As the above timeline indicates, all of the periods of delay between June 4, 2012 and November 13, 2012 were agreed to by the parties, both to facilitate potential pre-trial resolutions and to accommodate the replacement of defense counsel in both Case 2 and Case 1.

The delay between November 13, 2012 and the June 11, 2013 trial date was also properly excluded from the speedy trial calculation in order to provide Richardson's counsel with time to prepare for trial, as he had only recently been assigned to represent Richardson in Case 2. The district court appropriately granted the adjournment and exclusion requested by the government. Following the February 5, 2013 hearing, both parties agreed to a stipulation to exclude the period of time from the date of that hearing to the eventual trial date of June 11, 2013.

Altogether, the stipulations and orders entered by the district court provide for proper Speedy Trial Act exclusions for the entire duration between the original trial date of June 4, 2012 and the actual trial date of June 11, 2013. Accordingly, only the initial sixty-day period between Richardson's arraignment and the original June 4, 2012 trial date counted towards Richardson's Speedy Trial Act calculation. His trial therefore began before the seventy day deadline had elapsed, and his rights under the Speedy Trial Act were not violated as a result of delay.

### 3. Sixth Amendment Claim

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Const. amend. VI. We have recognized that the right to a speedy trial is typically "trigger[ed] [by] the filing of an indictment." *United States v. Watford*, 468 F.3d 891, 901 (6th Cir. 2006). In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court established a four factor test for courts to employ when assessing whether a defendant's right to a speedy trial has been violated. Under this test, courts consider and balance: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. "When a defendant's constitutional right to a speedy trial has been violated, dismissal of the indictment is the only remedy even when it allows a

defendant who may be guilty of a serious crime to go free." *United States v. O'Dell*, 247 F.3d 655, 667 (6th Cir. 2001).

### a. Length of Delay

The "length of delay" factor constitutes a "triggering mechanism." *Id.* at 667. "[I]f the delay is not uncommonly long, judicial examination ceases." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006). However, if this threshold requirement is met, it necessitates consideration of the remaining three factors. *Id.* As the government concedes, "[a] delay approaching one year is presumptively prejudicial." *Id.* In this case, the nearly two year delay between Richardson's indictment on July 12, 2011 and the start of his trial on June 11, 2013 necessitates a full consideration of the remaining *Barker* factors.

### b. Reason for the Delay

In weighing the second *Barker* factor, "[t]he core task is determining which party shoulders the balance of blameworthiness for [the] delay." *O'Dell*, 247 F.3d at 667. We have recognized that "[n]ot all delays are susceptible to equal blame." *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003). "[D]ifferent weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. Where a government's delay is motivated by "bad faith, harassment or attempts to seek a tactical advantage," these reasons "weigh heavily against the government." *Schreane*, 331 F.3d at 553. "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered . . . ." *Barker*, 407 U.S. at 531. Finally, "valid reasons for a delay weigh in favor of the government." *Robinson*, 455 F.3d at 607. The resolution of pretrial motions is viewed as a "presumptively justifiable reason[]" for delay. *O'Dell*, 247 F.3d at 668.

It is evident that Richardson, rather than the government, is responsible for much of the fourteen-month delay between his arraignment and trial. As has already been discussed, the delay between Richardson's arraignment and trial was largely caused by his conflicts with his counsel, the subsequent appointment of new defense counsel, and both parties' desire to seek pre-trial resolution that was dependent on separate proceedings in Case 1.

However, with respect to the period of nearly nine months that elapsed between Richardson's indictment on July 12, 2011 and his arraignment on April 5, 2012, the government is solely responsible. The government even conceded that this delay was partially caused by an oversight on its part. Nonetheless, a large portion of this period of delay appears to have been justifiable. When a defendant is in state, rather than federal, custody, it may be justifiable for the federal government to delay prosecution on federal charges. As we previously explained in *Schreane*:

> [T]o require the federal government to prosecute an accused before state proceedings have run their course would be to mire the state and federal systems in innumerable opposing writs, to increase inmate transportation back and forth between the state and federal systems with consequent additional safety risks and administrative costs, and generally to throw parallel federal and state prosecutions into confusion and disarray.

331 F.3d at 555 (internal quotation marks omitted). Until February 28, 2012, Richardson was in state custody, and the government needed to secure his presence by writ whenever he was needed in federal court for federal proceedings related to Case 1. Therefore, even if it was technically possible for the government to proceed with Richardson's Case 2 arraignment while he was in state custody, it was not plainly improper for the government not to have done so. Consequently, the only period of delay for which the government is solely responsible and has no excusable justification is the period of just over a month from February 28, 2012, when Richardson was released to federal custody, to April 5, 2012, when he was finally arraigned.

In sum, while Richardson and the government are both responsible for portions of the delay in bringing Richardson to trial, Richardson bears greater responsibility for it. *Cf. O'Dell*, 247 F.3d at 671 (finding a defendant's "culpability with respect to delay" to be "at least equal to that of the government" where the defendant had filed multiple interlocutory appeals).

### c. The Defendant's Assertion of His Right

"[A] defendant's assertion of his speedy trial right [] is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. Meanwhile, a defendant's "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532. The first time Richardson

asserted his speedy trial right was in his January 10, 2013 motion to dismiss.  At no point in time prior to the filing of this motion had any of Richardson's attorneys asserted a speedy trial claim.

The fact that Richardson waited eight months after he was arraigned and seventeen months after he was indicted before raising a speedy trial claim based primarily on pre-arraignment delay "is sufficient to cast doubt on the sincerity of [his] demand." *United States v. Williams,* 753 F.3d 626, 633-34 (6th Cir. 2014) ("The fact that [the defendant] did not assert his right to a speedy trial for some eight months after he was arraigned and sixteen months after he was arrested is sufficient to cast doubt on the sincerity of the defendant's demand." (internal quotation marks omitted)).

### d.  Prejudice to the Defendant

The last *Barker* factor that we must consider is whether Richardson was prejudiced by the delay.  "A defendant must show that 'substantial prejudice' has resulted from the delay." *Schreane*, 331 F.3d at 557.  The *Barker* Court provided guidance about the prejudice assessment, identifying three interests that should be considered for the purposes of the prejudice analysis: (1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility that the defense will be impaired.  *Barker*, 407 U.S. at 532.

The Supreme Court has noted that "[the] impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Doggett v. United States*, 505 U.S. 647, 655 (1992) (internal quotation marks omitted).  As such, "consideration of prejudice is not limited to the specifically demonstrable, and affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Brown v. Bobby*, 656 F.3d 325, 336 (6th Cir. 2011) (internal quotation marks omitted).  In certain cases of "excessive delay," prejudice can be presumed.  *Id.*  However, where there is no bad faith on the part of the government, "[t]his court has recognized that in the absence of particularized trial prejudice, delay attributable to the state's negligence has typically been shockingly long to warrant a finding of prejudice." *Id.* at 337 (internal quotation marks omitted).

Richardson argues that his defense was impaired because "two witnesses [Walter Hill and Anthony Pouncy] who would otherwise have been available to testify for the defense were unavailable at trial because they died during the delay." *Richardson's Br.* at 24. Richardson claims that both men would have testified that they themselves participated in the robbery charged in Case 2 and that Richardson did not participate in the robbery with them. Since Richardson points to no evidence that would substantiate his contention that Hill and Pouncy would have implicated themselves and testified on his behalf, the government contends that Richardson's claim of prejudice is speculative at best.

The district court, in considering Richardson's speedy trial claim in the first instance, concluded that the alleged exculpatory testimony would likely not have been available to Richardson even absent any delay. The court based this conclusion on the following observations and determinations. First, although Richardson was represented by counsel prior to the deaths of these purported witnesses, there is no indication that an investigation into either witness was undertaken by defense counsel. Second, neither individual was ever charged in relation to either the Case 1 or Case 2 robberies, and the government contended that neither individual had ever come up in their investigation of the crimes. Third, with respect to Walter Hill, who died on October 8, 2011, it is improbable that he would have been alive when Case 2 went to trial even absent a delay. Finally, it is unlikely that Pouncy would have testified at trial regarding his complicity in a crime for which he had not been charged that occurred while he was on probation.

Given these considerations and the absence of evidence to support Richardson's claim, the district court's determination that the allegedly exculpatory testimony would likely not have been available absent the delay is not clearly erroneous. Richardson has therefore failed to meet his burden of demonstrating that the delay resulted in "substantial prejudice." *Schreane*, 331 F.3d at 557. And, in the absence of "excessive delay" attributable to the government's negligence, Richardson is not entitled to a presumption of prejudice. *See Bobby*, 656 F.3d at 337.

### e. Balancing the Factors

The length of the delay between Richardson's indictment and his trial was substantial. Nonetheless, a balancing of the four *Barker* factors weighs against the dismissal of Richardson's indictment in Case 2. Richardson's complicity in the delay, the date he first asserted his speedy trial rights, and the lack of "substantial prejudice" support the conclusion that Richardson's Sixth Amendment right to a speedy trial was not violated.

## B. Prior Inconsistent Statements

The district court's evidentiary decisions are reviewed for abuse of discretion. *Schreane*, 331 F.3d at 564.

Richardson argues that the district court erred by not admitting the prior inconsistent statements of two government witnesses as extrinsic evidence under Rule 613(b) of the Federal Rules of Evidence. Jerome Andrews and Derrick Bivens, two participants in the robberies, testified for the government about Richardson's role in the crimes. During cross-examination, Richardson's attorney sought to introduce letters signed by Andrews and Bivens while they were in jail that contradicted their trial testimony and renounced Richardson's participation in the crimes. The district court permitted Richardson's attorney to read the letters out loud and attempt to use these letters to impeach the witnesses' credibility, but did not allow Richardson to introduce the letters themselves as extrinsic evidence. The district court determined that the statements in the letters were hearsay and provided a limiting instruction to the jury explaining that the statements could only be used to determine the witnesses' credibility, and not for the truth of the matter asserted. When questioned, both Andrews and Bivens admitted to having written or affirmed the prior inconsistent statements.

Federal Rule of Evidence 613(b) "provides for impeachment of a witness with extrinsic evidence of a prior inconsistent statement if the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon." *United States v. Lester*, 238 F. App'x 80, 83 (6th Cir. 2007) (internal quotation marks omitted). While Rule 613(b) permits a party to use extrinsic evidence to challenge a witness' credibility, it cannot be used to establish which of two inconsistent statements is true. *United*

*States v. Fonville*, 422 F. App'x 473, 482 (6th Cir. 2011); *see United States v. Pandilidis*, 524 F.2d 644, 650 (6th Cir. 1975) ("While evidence of contradictory statements may be used to impeach [a witness], they may not be introduced to prove the truth of the statements offered.").

Where, as here, a witness admits to having made prior inconsistent statements, circuits are split as to whether a defendant is entitled to introduce extrinsic evidence of those statements. *Compare United States v. Lashmett,* 965 F.2d 179, 182 (7th Cir. 1992) (adopting a broad reading of Rule 613), *with United States v. Soundingsides*, 820 F.2d 1232, 1240 (10th Cir. 1987) ("Where the witness does not deny making a prior inconsistent statement, there is clearly no rationale for the introduction of a prior 'inconsistent' statement." (internal quotation marks omitted)). This Circuit has yet to decide this issue, and we need not do so today. In this case, even if the district court's failure to admit the letters themselves was erroneous, such omission was harmless. Both witnesses admitted to having made prior inconsistent statements, and the district court permitted Richardson to read the actual statements to the jury. Consequently, Richardson was able to effectively impeach both witnesses and was not prejudiced by his inability to introduce extrinsic evidence of these statements. *See United States v. Davis*, 28 F.3d 1214, No. 93-5984, 1994 WL 362061, at *3 (6th Cir. 1994) (table) ("[T]he district court's refusal to admit the [extrinsic evidence] under Rule 613 was harmless, if error, as the substance of the inconsistent statement was before the jury and admission of the affidavit itself would have been cumulative.").

### C. Impeachment with Unrelated Judicial Opinion

We generally review a district court's evidentiary rulings for abuse of discretion. *United States v. Holden*, 557 F.3d 698, 703 (6th Cir. 2009). Evidentiary rulings challenged as violating the Sixth Amendment's Confrontation Clause are reviewed *de novo*. *United States v. Adams*, 722 F.3d 788, 829 (6th Cir. 2013).

Richardson argues that the district court erred by refusing to permit him to impeach a government witness, Officer Herzog, with a prior judicial finding that Herzog's testimony was not credible. Richardson contends that the court's decision to disallow the introduction of this evidence under Federal Rules of Evidence 608(b) and 403 violated his Sixth Amendment Confrontation Clause rights.

The extrinsic evidence at issue is a 2002 opinion in which the Honorable Denise Page Hood of the Eastern District of Michigan granted a motion to suppress evidence in an unrelated case (hereinafter "2002 case"). *United States v. Nelson,* No. 02-cr-80254, slip op. at 7, 9 (E.D. Mich. Sept. 4, 2002). In that opinion, the district judge determined that two officers, one of whom was Officer Herzog, lacked probable cause for a traffic stop. In reaching this decision, the district judge expressed skepticism regarding the credibility of the officers' testimony. Although the opinion did not differentiate between the testimony of the two officers in making the subsequent credibility determination, it bears noting that the testimony of the officers differed substantially. While Officer Herzog's partner testified that he saw a gun in the defendant's waistband and that he saw the defendant urinating in a public alley, Officer Herzog testified that he did *not* see a gun in the defendant's waistband, but that he did see the defendant urinating in public. The district judge found that, given the poor lighting in the alley, the officers would not have been able to see a gun in the defendant's waistband from their location. This finding is not inconsistent with Officer Herzog's testimony. With regard to the officers' testimony about public urination, the district judge noted that "[t]he Court finds incredible that Defendant would urinate in public in the manner described by the officers." *Id.* at 7.

The district court in this case excluded the 2002 opinion as impermissible collateral evidence under Rule 608(b) and also under Rule 403, due to the concern that introducing this opinion would lead to jury confusion and prejudice to the government.

### 1. Federal Rules of Evidence 608(b) and 403

Rule 608(b) of the Federal Rules of Evidence provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." However, Rule 608(b) also provides that "the court may, on cross-examination, allow [these specific instances] to be inquired into if they are probative of the character for truthfulness or untruthfulness of [a witness]." We have previously noted that Rule 608(b)'s prohibition on extrinsic evidence is "designed to prevent distracting mini-trials on collateral matters." *Boggs v. Collins,* 226 F.3d 728, 744 (6th Cir. 2000). Rule 608(b) therefore places "within the discretion of the trial court" whether to permit cross-examination about specific conduct that may be probative of a witness' truthfulness or lack therefore. *Id.*

In this case, the district court determined that the judicial opinion Richardson sought to introduce on cross-examination: (1) was the type of evidence intended to be precluded by Rule 608(b), (2) was not clearly probative of the witness' character for truthfulness, (3) would likely confuse or mislead the jury, and (4) could prejudice the government. The district court did not abuse its discretion in reaching these conclusions. As a preliminary point, a judicial opinion making a credibility determination does indeed appear to be the type of extrinsic evidence disallowed by Rule 608(b). *See United States v. Taylor,* 471 F. App'x 499, 521 (6th Cir. 2012) (opining that an opinion written by a district judge "may not be admitted as extrinsic evidence" under Rule 608(b)); *United States v. Mendez,* 303 F. App'x 323, 325 (6th Cir. 2008) (finding that official reports of a witness interview were inadmissible under Rule 608(b) as extrinsic evidence of collateral matters).

Moreover, the district court was within its discretion in determining both that the cross-examination sought by Richardson would likely lead to jury confusion and that it lacked probative value. The district court's credibility determination in the 2002 case was generalized as to both testifying officers and seemed to relate to Officer Herzog primarily with respect to the question of whether a defendant urinated in an alley in a particular manner at a particular time of night. It was reasonable for the district court in this case to conclude that the previous district judge's incredulity regarding Officer Herzog's testimony was not probative of his general character for truthfulness. Additionally, given the context and nature of this credibility assessment, if the 2002 case were raised on cross-examination, the jury would need to be presented with detailed testimony regarding an entirely collateral matter in order to assess its probative value. This type of collateral "mini-trial" is precisely what Rule 608(b) is intended to prevent, and why the decision of whether or not to permit such cross-examination should be, and is, within the district court's discretion.

Richardson further contends that the district court erred in its application of Rule 403 of the Federal Rules of Evidence because Officer Herzog's testimony was important to the government's case. However, Richardson misconstrues the Rule 403 analysis. Rule 403 allows the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." The

district court acted within its discretion in determining that the limited probative value of the 2002 case was outweighed by the danger that the jury would be confused or misled and the possibility of prejudice to the government.

### 2.  Confrontation Clause

Richardson also argues that the district court's decision not to permit cross-examination regarding the 2002 case violated his Sixth Amendment right to confront and cross-examine witnesses.  The Confrontation Clause of the Sixth Amendment guarantees a defendant "an opportunity for effective cross-examination."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis omitted).  It does not guarantee the right to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Id.*  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant."  *United States v. Cunningham*, 679 F.3d 355, 384 (6th Cir. 2012) (internal quotation marks omitted).

As has already been discussed, the district court's decision to prohibit cross-examination regarding the 2002 case was based on prudential concerns that fall within the court's "wide latitude" to impose limits on cross-examination, namely concerns about jury confusion, prejudice to the government, and interrogation that is only marginally relevant.  *See id.*  Accordingly, the district court did not violate Richardson's right to cross-examination under the Confrontation Clause by prohibiting cross-examination regarding the 2002 case.

### D.  Jury Instructions Regarding 18 U.S.C. § 924(c)

We review challenges to jury instructions for abuse of discretion.  *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008).  "'When jury instructions are claimed to be erroneous, we review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision.'"  *Id.* (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)).  Trial courts are afforded broad discretion "in crafting jury instructions and [do] not

abuse [their] discretion unless the jury charge fails accurately to reflect the law." *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007) (internal quotation marks omitted). We will reverse a judgment due to an improper jury instruction only where the instructions, when "viewed as a whole," are found to be "confusing, misleading, or prejudicial." *Id.*

### 1. The Aiding and Abetting Instruction

Richardson argues that the district court abused its discretion by instructing the jury that he could be found guilty of an 18 U.S.C. § 924(c) violation on a theory of aider and abettor liability even though that theory of liability was not specifically referenced in the indictments. His argument lacks merit. This question is directly controlled by our decision in *United States v. McGee*, 529 F.3d 691 (6th Cir. 2008), where we held that aiding and abetting is "a theory of liability embodied in every federal indictment, whether specifically charged or not, and not a distinct substantive crime." *McGee*, 529 F.3d at 695 (internal quotation marks omitted). Therefore, "an indictment need not explicitly refer to aiding or abetting to support a jury verdict based on a finding under that theory." *Id.*

Richardson concedes that *McGee* is directly applicable to this case. Furthermore, Richardson acknowledges that *McGee* necessitates the conclusion that the district court's inclusion of jury instructions on aiding and abetting was not erroneous. Even so, Richardson contends that *McGee* was wrongly decided and asks us to revisit this question. This we cannot do. As is clearly stated in Sixth Circuit Rule 32.1(b), "[p]ublished panel opinions are binding on later panels. A published opinion is overruled only by the court en banc." We are therefore not at liberty to overrule the previous decision in *McGee*. The district court did not abuse its discretion by instructing the jury on aiding and abetting as an alternative theory of liability.

### 2. Failure to Instruct on Knowledge Requirement

The district court erred by omitting a necessary element in its jury instructions regarding aiding and abetting an 18 U.S.C. § 924(c) violation; however, this was harmless error. Section 924(c) creates liability for using or carrying a firearm during and in relation to a crime of violence. Richardson was convicted of five counts of violating § 924(c) under an aiding and abetting theory of liability. Richardson argues that the jury instructions provided by the district

court relating to this crime were erroneous because they failed to explain that Richardson needed prior knowledge that a firearm was present in order to be convicted as an aider or abettor.

The resolution of this issue is governed by the Supreme Court's recent decision in *Rosemond v. United States*, which addressed "what the Government must show when it accuses a defendant of aiding or abetting [a § 924(c)] offense." 134 S. Ct. 1240, 1243 (2014). The Court determined that a participant in a predicate crime "has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun." *Id.* at 1249. Consequently, the Court found erroneous jury instructions that "failed to require that the defendant knew in advance that one of his cohorts would be armed." *Id.* at 1243.

Richardson argues that the concerns implicated in the *Rosemond* jury instructions are implicated in his case as well. With regard to aiding and abetting a § 924(c) violation, the district court provided the following jury instructions:

> [F]or you to find Mr. Richardson guilty of using or carrying a firearm during and in relation to a federal crime of violence as an aider and abettor, you must be convinced that the government has proven each and every one of the following three elements beyond a reasonable doubt.
>
> First, that the crime of using or carrying a firearm during and in relation to a federal crime of violence, robbery affecting commerce, was committed.
>
> Second, that Mr. Richardson helped to commit the crime.
>
> And, third, that Mr. Richardson intended to help commit the crime.

(R. 214, Jury Instructions, Page ID # 2574-75.) The government contends that these jury instructions satisfy the requirements set out in *Rosemond*, "albeit perhaps not as artfully worded as may be desired." *Appellee's Br.* at 53. According to the government, the knowledge requirement is implied in the district court's jury instruction regarding the third element of aiding and abetting, which states: "that Mr. Richardson intended to help commit the crime." (R. 214, Jury Instructions, Page ID # 2575.) The government's interpretation of this jury instruction is dependent on a peculiar reading in which the word "crime" in the relevant section is defined as the crime of using or carrying a firearm during a robbery, rather than as the crime of perpetrating the robbery itself. This reading is at odds with the most obvious reading of the jury instructions, under which the word "crime" refers to the predicate crime of robbery, not to the § 924(c)

violation. Under this more natural reading, these jury instructions fail to satisfy *Rosemond* as they insufficiently explain the knowledge requirement necessary to convict Richardson of aiding and abetting a § 924(c) violation.

Nonetheless, the district court's improper jury instructions amount to harmless error. "[A] jury instruction that misdescribes or omits an element of an offense is subject to harmless error review." *United States v. Tarwater*, 308 F.3d 494, 521 (6th Cir. 2002) (citing *Neder v. United States*, 527 U.S. 1, 9-10 (1999)). This is so because such errors do not "render the trial fundamentally unfair." *United States v. Stewart*, 306 F.3d 295, 319 (6th Cir. 2002). "The [Supreme] Court [has] noted that omission of a jury instruction differs markedly from the constitutional violations [it has] found to defy harmless-error review." *Id.* (internal quotation marks omitted).

Where the reviewing court "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . it should not find the error harmless." *Neder*, 527 U.S. at 19. In *Neder*, the Supreme Court explained that:

> A reviewing court making this harmless-error inquiry does not . . . become in effect a second jury to determine whether the defendant is guilty. Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not reflect a denigration of the constitutional rights involved.

*Id.* (internal citations and quotation marks omitted).

The government contends that any jury instruction error was harmless because "[t]he robberies and the guns were so interconnected that it is inconceivable that a jury could find Richardson intended to commit, or assist in the commission of, the robberies but not the *armed* robberies." *Appellee's Br.* at 56 (emphasis added). A review of the record in this case confirms the government's assertion. Richardson's § 924(c) convictions were based on five armed robberies. According to the government's theory of the crimes, Richardson's role in these robberies was as the planner, facilitator, and driver. His conviction was based largely on the testimony of three other participants in the crimes who provided similar testimony regarding Richardson's role. The use of firearms was a consistent characteristic of the five robberies at

issue and the government's key witnesses all attributed the gun procurement to Richardson. It is implausible that a jury would simultaneously believe the portions of the government witnesses' testimony establishing Richardson's liability for the predicate robberies but not believe the portions of the testimony regarding Richardson's knowledge of the use of firearms. The record simply does not contain "evidence that could rationally lead to a contrary finding with respect to the omitted element." *Neder*, 527 U.S. at 19. Accordingly, although the jury instructions were erroneous, this error was harmless.

### E. Constitutionality of Richardson's Sentence

"A constitutional challenge to a sentence is a question of law and reviewed *de novo*." *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009).

Richardson raises a number of constitutional challenges to his 1,494 month sentence, which is comprised largely by his consecutive mandatory sentences under 18 U.S.C. § 924(c). Section 924(c) establishes mandatory minimum sentences for using or carrying a firearm during and in relation to any crime of violence. In particular, § 924(c)(1)(A) establishes a mandatory minimum sentence of seven years of incarceration for an individual's first conviction under § 924(c), and § 924(c)(1)(C) establishes a 25 year mandatory minimum sentence "[i]n the case of a second or subsequent conviction under this subsection." Section 924(c)(1)(D)(ii) further mandates that sentences under § 924(c) must run consecutively with any other terms of imprisonment. Richardson specifically contends that his consecutive mandatory minimum sentences under § 924(c) and (d) violate: (1) separation of powers, (2) the Fifth Amendment right to an individualized sentence, (3) equal protection, and (4) the Eighth Amendment's prohibition against cruel and unusual punishment. These arguments fail.

#### 1. Separation of Powers

Richardson first argues that the consecutive mandatory minimum sentences at issue violate the separation of powers doctrine by "stripp[ing] the judiciary of its constitutional and judicial prerogative in sentencing." *Richardson's Br.* at 39. The Supreme Court has recognized that "Congress, of course, has the power to fix the sentence for a federal crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control." *Mistretta v.*

Nos. 13-2655/2656          *United States v. Richardson*          Page 24

*United States*, 488 U.S. 361, 364 (1989) (internal citations omitted).  We previously denied a separation of powers challenge to a mandatory minimum sentence in *United States v. Cecil*, noting that we have "'flatly rejected' the claim that mandatory minimums unconstitutionally violate separation-of-powers principles."  615 F.3d 678, 696 (6th Cir. 2010) (quoting *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008)).  Richardson recognizes this existing precedent, but "asks this Court to revisit the *Cecil* holding that rejected the separation of powers argument."  *Richardson's Br.* at 40.  This panel cannot grant Richardson's request.  As was explained earlier in this opinion, pursuant to Sixth Circuit Rule 32.1(b), "[p]ublished panel opinions are binding on later panels.  A published opinion is overruled only by the court en banc."

### 2.  Right to an Individualized Sentence

Richardson next argues that his consecutive mandatory minimum sentences violate his right to individualized sentencing under the Due Process clause of the Fifth Amendment.  This argument is also foreclosed by this Circuit's existing precedent.  In *Odeneal*, we recognized "that there is no constitutional right to individualized sentencing in non-capital cases."  517 F.3d at 415; *see also United States v. Levy*, 904 F.2d 1026, 1035 (6th Cir. 1990).  As this is a non-capital case, Richardson's argument is foreclosed by this precedent.  Once again, Richardson invites us to reconsider our previous holdings and, once again, we are not empowered to do so.

### 3.  Equal Protection

Richardson also argues that his mandatory minimum sentences deprive him of the equal protection of the law.  The Supreme Court has acknowledged that the Fifth Amendment contains "an equal protection component" applicable to the federal government.  *United States v. Hughes*, 632 F.3d 956, 960 (6th Cir. 2011) (citing to *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 543 n. 21 (1987)).  "The analysis of a Fifth Amendment equal protection claim is identical to an equal protection claim under the Fourteenth Amendment."  *Id.*  Where a legislative distinction does not target a suspect class or implicate a fundamental right, it need only have a rational basis to survive an equal protection challenge.  *LensCrafters, Inc. v. Robinson,* 403 F.3d 798, 806 (6th Cir. 2005).

Nos. 13-2655/2656     *United States v. Richardson*     Page 25

Richardson claims that the sentence required by 18 U.S.C. § 924(c) impinges on his fundamental right to liberty. However, no such right to liberty exists for a person who has been "justly convicted." *Hughes*, 632 F.3d at 962. Accordingly, the challenged mandatory minimum sentences must survive only rational basis review. Of particular concern to Richardson is the sentencing disparity implicit in § 924(c)(1)(C)'s higher mandatory minimum sentence for individuals who have been convicted under § 924(c) for a second or subsequent offense. Richardson argues that this disparity lacks a rational basis.

We have previously held that, "[w]here rational basis review governs, we will not strike down a statute on equal protection grounds unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Johnson v. Bredesen*, 624 F.3d 742, 747 (6th Cir. 2010) (internal quotation marks omitted). The government argues that § 924(c) survives rational basis review because the statute's sentencing discrepancy between first time offenders and repeat offenders can be justified by the legitimate governmental goal of deterring recidivism. *See United States v. Raynor*, 939 F.2d 191, 194 (4th Cir. 1991) (rejecting a comparable challenge to § 924(c) and recognizing "the clear intent of § 924(c) to deter the use of firearms in the commission of crimes and to increase the cost of committing a second offense"). Richardson has failed to demonstrate that this governmental purpose is illegitimate and that § 924(c) is not rationally related to achieving this purpose. Thus, he has failed to establish that his mandatory minimum sentences under § 924(c) infringe upon his right to equal protection of the law.

### 4. Cruel and Unusual Punishment

Finally, Richardson argues that his 1,494 month sentence violates the Eighth Amendment's ban on cruel and unusual punishment inasmuch as it is "grossly disproportionate" to his criminal conduct. *Richardson's Br.* at 42. "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). Sentences are not deemed cruel and unusual simply by virtue of being mandatory. *United States v. Wimbley*, 553 F.3d 455, 463 (6th Cir. 2009).

Nos. 13-2655/2656     *United States v. Richardson*     Page 26

We have regularly upheld sentences exceeding 1,494 months for § 924(c) violations related to armed robberies. For example, in *United States v. Watkins*, we upheld a 1,772 month sentence for a defendant who had been convicted of six § 924(c) violations associated with the commission of robberies. 509 F.3d 277, 283 (6th Cir. 2007). Despite acknowledging that "the Eighth Amendment places an outer limit on criminal penalties that are grossly disproportionate to the offense," we concluded that due to the "numerosity and seriousness of the offenses, the comparable sentences imposed by this circuit in similar circumstances, and the requirement that sentences for § 924(c) firearms convictions run consecutively to all other sentences, [the defendant's] sentence [was] not grossly disproportionate to the offenses." *Id.* at 283; *see also United States v. Clark*, 634 F.3d 874, 878 (6th Cir. 2011) (finding that a 2,269 month sentence for six robberies did not violate the Eighth Amendment); *United States v. Willis*, 232 F. App'x 527, 539 (6th Cir. 2007) (finding that a 1,920 month sentence for seven armed robberies was not cruel and unusual); *United States v. Wiley*, 132 F. App'x 635, 643 (6th Cir. 2005) (finding that a 3,184 month sentence for eleven armed robberies did not violate the Eighth Amendment); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000) (finding that a 2,242 month sentence for nine robberies did not violate the Eighth Amendment).

In light of this Circuit's consistency in upholding similar sentences for § 924(c) convictions in comparable circumstances, Richardson's 1,494 month sentence cannot be deemed grossly disproportionate and therefore does not constitute an Eighth Amendment violation.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgments of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 13-2655/2656

UNITED STATES OF AMERICA,
               Plaintiff - Appellee,

    v.

FRANK RICHARDSON,
               Defendant - Appellant.

```
┌──────────────────────────────┐
│            FILED             │
│          Jul 13, 2015        │
│    DEBORAH S. HUNT, Clerk    │
└──────────────────────────────┘
```

Before: COLE, Chief Judge; MOORE and CLAY, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgments of the district court in cases numbered 13-2655 and 13-2656 are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk